**KAUFMAN COMPANY, INC.,**
**Plaintiff/Cross–Appellant,**

v.

**LANTECH, INC., Defendant–Appellant.**

**Nos. 89–1381, 89–1406.**

United States Court of Appeals,
Federal Circuit.

Feb. 21, 1991.

Mark C. Schaffer, Emch, Schaffer, Schaub & Porcello Co., L.P.A., Toledo, Ohio, argued, for plaintiff, cross-appellant. With him on the brief, were Gregg W. Emch and James F. Porcello, Jr.

John S. Reed, Hirn, Reed, Harper & Eisinger, Louisville, argued, for defendant-appellant. With him on the brief, was Michael A. Valenti.

Before RICH, Circuit Judge, SMITH, Senior Circuit Judge, and RE, Chief Judge.[*]

EDWARD S. SMITH, Senior Circuit Judge.

This appeal concerns computation of damages for the infringement of United States Patent No. 4,302,920 (" '920 patent") which was assigned to appellant, Lantech, Inc. ("Lantech"). Erstwhile, we affirmed the judgment that appellee, Kaufman Company, Inc. ("Kaufman"), was liable for willful infringement of the '920 patent.[1]

In the subsequent accounting trial, the United States District Court for the Northern District of Ohio awarded Lantech damages comprising lost profits for eight of the forty-four infringing sales, reasonable royalties on the remaining thirty-six sales and prejudgment interest at a rate of 8.94%. On appeal, we conclude that damages of lost profits should have been

---

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a).

1. *Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 1 USPQ2d 1202 (Fed.Cir.1986).

awarded for all forty-four infringing sales and affirm the prejudgment interest rate.

## Background

This case concerns the development of a technology called stretch wrapping. Stretch wrapping machines are used to wrap plastic film around a load of boxes stacked on a pallet to securely bind the load together. Stretch wrapping technology is designed to stretch the film beyond its point of elasticity as it is wrapped around the load. This excessive stretching makes the plastic film stronger and also reduces the quantities of plastic film required to wrap the load. Since 1970, there have been three advancements in stretch wrapping technology. They are conventional stretch wrapping, film-driven mechanical prestretch wrapping, involved here, and powered prestretch wrapping.

The first stretch wrapping devices patented and produced by Lantech since 1970 are now referred to as conventional stretch wrapping machines. The conventional method achieves stretching by utilizing a friction device to retard the release of the film from its dispenser roll. As the load revolves on a rotating pallet, the load pulls the film from the recalcitrant dispenser roll thereby stretching the film. The process continues until the load is securely wrapped.

The conventional machines were the finest available at the time of their introduction, but it was difficult to achieve optimum film stretch levels through use of the friction devices. The inconsistent force applied to the film resulted in both repeated film failures and unnecessarily high wrapping costs. Moreover, the conventional method exerted pressure on the load being wrapped, often damaging the load.

The second advancement in stretch wrapping technology was the invention of a film-driven mechanical prestretch machine. This particular technology which is the subject of the present appeal was disclosed in the '920 patent assigned to Lantech. The film-driven mechanical prestretch device has the special feature of achieving a desired stretch level before the plastic film is applied to the load. Thus, the force associated with stretching the film is not exerted on the load being wrapped, so there is no risk of damage to the load.

The third development in stretch wrapping technology was the powered prestretch wrapping machine. Lantech patented this technology, and the enforceability of the patent is being litigated in a separate case that has no bearing on the present case at bar. Powered prestretch had the primary advantage of achieving higher stretch levels than any other process because it was "powered".

Powered prestretch was more elaborately designed, constructed and operated than film-driven prestretch machines. Therefore, powered prestretch was much more expensive to purchase and operate than film-driven prestretch machines. Film-driven prestretch and powered prestretch machines were introduced into the market at approximately the same time. However, at the time of its introduction, the powered prestretch technology was not sufficiently developed to warrant widespread acceptance in the market. Because film-driven prestretch achieved high levels of stretch in its own right, the film-driven prestretch technology was preferred in the market until the powered prestretch technology had matured.

Lantech initially marketed film-driven prestretch as "Roller Stretch" in the summer of 1980 with great success. Due to Lantech's success with film-driven prestretch, Lantech's sales of conventional stretch wrapping machines declined drastically. The '920 patent covering film-driven prestretch did not issue to Lantech until December 1, 1981. Since the date of issuance, Kaufman, a leading competitor of Lantech, made forty-four sales which infringed on Lantech's patent rights. Kaufman ceased its infringing sales of film-driven prestretch and began marketing powered prestretch machines for two principal reasons. First, Lantech exerted legal pressure on Kaufman and its customers to stop the infringement. Second, advances in powered prestretch technology made it a desirable alternative to customers.

## Procedural Posture

On December 30, 1981, one month after the '920 patent issued to Lantech, Kaufman filed a declaratory judgment action against Lantech in the United States District Court for the Northern District of Ohio alleging that the '920 patent was invalid. Lantech counterclaimed asserting that Kaufman had infringed on its patent rights. On December 16, 1986, we affirmed the conclusion of the district court that the '920 patent was not invalid and was willfully infringed.[2] Lantech was awarded double damages and prejudgment interest.

The accounting trial then proceeded in the Northern District of Ohio in August of 1988. The district court concluded that lost profit damages were warranted under 35 U.S.C. § 284[3] for only eight of the forty-four infringing sales.

The district court applied the test found in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978), to determine if lost profits should be awarded. In denying lost profits on thirty-six infringing sales, the court found that all but one of the requisite elements were present. The court relied on the fact that Lantech failed to present evidence indicating that every infringing purchaser would *not* have accepted a non-infringing substitute to the film-driven prestretch technology.

For those infringing purchases that warranted lost profit damages, the court also awarded lost profits attributed to lost sales of spare parts but excluded damages for lost sales of plastic film. For the other thirty-six infringing sales, reasonable royalties were awarded at a rate of fourteen percent. Prejudgment interest was also awarded to Lantech. Initially, the prejudgment interest rate was set at 7.87% per year, but upon review the district court raised the rate to 8.94%. In sum, Lantech was awarded damages totalling $692,-815.00.

Lantech has appealed to this Court and Kaufman has cross-appealed. Both parties assert that the district court erred in calculating the appropriate damages.

## Issues

We must decide whether the district court applied the correct rule of law in finding that there existed acceptable noninfringing substitutes, thereby denying lost profits damages for thirty-six of the forty-four infringing sales. Because we find that the district court applied an incorrect standard of law which caused it to calculate damages that were clearly erroneous, we need not examine the reasonable royalty rate. Furthermore, we must decide whether the district court abused its discretion in setting the prejudgment interest rate.

## Lost Profit Damages

*1. The Assessment of Damages by the District Court.*

■ A court shall award damages adequate to compensate the patentee for infringement, but in no event less than a reasonable royalty.[4] Generally, in determining whether the infringing sales caused Lantech to lose profits the district court must have concluded (1) that the patent owner would have made the sale but for the infringement, *i.e.*, causation existed, and (2) that proper evidence supporting the computation of lost profits was presented at trial.[5] The only specific test approved by this Court in determining whether the infringement caused profits to be lost was introduced in *Panduit*, 575 F.2d at 1156, 197 USPQ at 730.[6] The *Panduit* test has four requirements. To obtain damages for lost profits, the patentee must prove (1) a demand for the patented product, (2) the

---

**2.** *Kaufman Co.*, 807 F.2d 970, 1 USPQ2d 1202.

**3.** (1982).

**4.** 35 U.S.C. § 284 (1982).

**5.** *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863, 226 USPQ 402, 409 (Fed.Cir.1985), *cert.*

*denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

**6.** *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1579, 220 USPQ 490, 494 (Fed.Cir. 1983).

marketing and manufacturing capability to exploit demand, (3) an absence of acceptable noninfringing substitutes, and (4) the amount of profit the patentee would have made.[7]

In the trial of this case, the district court found that lost profits should not be awarded on all infringing sales because the third *Panduit* element was not satisfied; *i.e.*, that Lantech failed to show that all of Kaufman's infringing customers would not have accepted a noninfringing substitute. In arriving at its decision the district court labeled the question of acceptability of noninfringing substitutes as "subjective and highly individualized".

The district court found that Lantech met its burden of proof for two customers accounting for only eight machine sales out of forty-four infringing sales. This finding was based on the fact that Lantech presented specific evidence on the absence of acceptable noninfringing substitutes only for those two customers. The district court found that Lantech did not present evidence indicating that each of the remaining individual infringing purchasers would *not* have accepted a noninfringing substitute. Therefore, lost profits damages for the corresponding thirty-six infringing purchases were denied. We conclude that the district court made an error of law by placing an excessively onerous burden on the patentee.

*2. The Law on Lost Profits Damages.*

■ A patentee need not negative every possibility that the purchaser might not have bought another product other than his absent the infringement.[8] Instead, the patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringe-

ment.[9] Therefore, the issue of whether a patentee deserves lost profit damages is not based on a subjective, individualized inquiry, but on an objective standard of "reasonable probability".

■ The loss of profits is not presumed to result automatically from infringing sales. However, the satisfaction of all four *Panduit* requirements compels us to find that it is reasonable to infer that the patentee probably would have made the sale but for the infringing sale.[10] The same inference can be compelled by another course. When the patentee and the infringer are the only suppliers present in the market, it is reasonable to infer that the infringement probably caused the loss of profits.[11] Consequently, when the fact situation compels the reasonableness of the inference via both courses, the inference approaches conclusiveness.

■ Any doubts regarding the calculatory precision of the damage amount must be resolved against the infringer.[12] Again, a patentee need not negate every possibility that the purchaser might not have purchased a product other than his absent the infringement.[13] *Lam* and *Gyromat* both represent the pervading principle that doubt in ascertaining appropriate damages comes down against the infringer. This principle is in accord with the rule of law that the patentee need only show that there was a reasonable probability that the infringing sales caused the loss of profits.[14] Therefore, when the patentee establishes the reasonableness of the inference, the patentee has sustained the burden of proving his entitlement to lost profits for all infringing sales. The onus is then placed on the infringer to show that it is unreasonable to infer that some or all of the in-

---

7. *Panduit*, 575 F.2d at 1156, 197 USPQ at 730.

8. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 554, 222 USPQ 4, 8 (Fed.Cir.1984).

9. *Id.* at 553, 222 USPQ at 7.

10. *See, e.g., Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616, 222 USPQ 654, 663 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).

11. *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983).

12. *Id.*

13. *Gyromat*, 735 F.2d at 554, 222 USPQ at 8.

14. *Id.* at 553, 222 USPQ at 7.

fringing sales probably caused the patentee to suffer the loss of profits.

### 3. Analysis of the Panduit Test by the District Court.

In the trial below, the district court found that there was a demand for the patented film-driven prestretch machines, that Lantech had the manufacturing and marketing capability to make the sales that Kaufman made, and that Lantech showed with particularity how much profit it would have received had it made all forty-four sales that Kaufman made. However, because the district court concluded that the conventional prestretch and the powered prestretch were available acceptable noninfringing substitutes, the *Panduit* test was not satisfied. Consequently, the district court found the inference "that Lantech would have made every sale that Kaufman made merely because they were the only suppliers of film-driven prestretch machines" was inapplicable.

▪ The district court found that Kaufman made many of the infringing sales not because of the technology embodied in the '920 patent, but because of Kaufman's ability to customize. This "ability to customize" is irrelevant to the availability of acceptable noninfringing substitutes.[15] Therefore, the fact that Kaufman had the ability to customize does not support the district court conclusion that acceptable noninfringing substitutes were available.

▪ From the fact that twenty-eight to thirty-eight percent of Lantech's sales came from powered and conventional machines, the district court inferred that such machines were acceptable substitutes. This inference is clearly erroneous. It does not follow that just because a supplier sells several different lines of products, each line differing in cost and qualities, that each line is an acceptable substitute for the other.

To be deemed *acceptable*, the alleged acceptable noninfringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product.[16] Therefore, we must determine if powered prestretch and conventional prestretch machines satisfied this standard.

### 4. The Acceptability of Powered and Conventional Prestretch Machines.

▪ The powered prestretch machines were not fully developed or accepted in the market until certain improvements were added to the machine. These improvements were not made until 1982, which is at the end of the infringement period. Thus, powered prestretch was not an acceptable purchase option during the infringement period. On the other hand, film-driven prestretch machines were effective and "much more simple in design, construction and operation than powered prestretch machines." Furthermore, powered prestretch machines were more expensive to purchase and operate than the film-driven machines. A technology that was immature and more expensive than the patented technology during the time of infringement cannot have been an acceptable noninfringing substitute.

▪ The district court noted that film-driven prestretch had advantages over the conventional wrapping machine, one of which was that the film-driven machines did not have a tendency to damage the load being wrapped. Film-driven prestretch machines were easier to operate than conventional machines and also used less film per load than conventional machines. Moreover, film-driven prestretch produced consistent stretch levels, an improvement that was demanded by customers who purchased stretch wrapping machines.

▪ "A product lacking the advantages of that patented can hardly be termed a substitute acceptable to the customer who

15. *See, Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 825, 11 USPQ2d 1321, 1324 (Fed.Cir.1989) (customer preference also is not relevant to the second *Panduit* element which requires the pat-

entee to possess the marketing and manufacturing capability to exploit demand).

16. *Gyromat,* 735 F.2d at 553, 222 USPQ at 7.

wants those advantages." [17] Neither of the alleged substitutes possessed all the beneficial characteristics of the patented device, and the powered prestretch machine was found to be more expensive than the patented film-driven machine. Therefore, we conclude the finding of the district court that the conventional and mechanical prestretch machines were acceptable noninfringing substitutes during the period of infringement is clearly erroneous.

### 5. Lost Profits Damages are Warranted for All Forty–Four Infringing Purchases.

■ Because the district court should have found that there was an absence of acceptable noninfringing substitutes, the *Panduit* test is satisfied. This positive determination indicates the reasonableness of the inference that Lantech probably would have made all the sales but for the occurrence of the infringing sales.[18] In ordinary cases, this finding alone would be sufficient to base an award of lost profits damages assuming that the alleged infringer did not present evidence to successfully rebut the inference. However, the same inference is compelled by another route.

Only two suppliers of the patented product were competing in the market for film-driven prestretch machine sales, Lantech, the patentee, and Kaufman, the infringer. The existence of this fact also supports the inference that it is reasonably probable that the infringing sales caused the profits to be lost.[19]

The reasonableness of the inference is supported by both the *Lam* situation and the *Panduit* test. The satisfaction of both criteria provides strong indicia that the infringement probably caused the loss of profits. Therefore, the inference approaches conclusiveness. However, Kaufman did have the opportunity to rebut the inference that some or all of the infringing sales did not cause Lantech to lose profits.

■ The district court cited three grounds for finding unreasonable the inference that Lantech probably would have made all the sales but for the infringement. First, Kaufman had a reputation for performing customized work and was preferred in the market. Second, at least one infringing purchaser chose Kaufman because of its thorough specifications and reasonable price. Last, Lantech admitted at trial that it would not have tried to sell its machines to Kaufman distributors, which accounted for at least nine infringing sales.

The first and second reasons cited bear on the preference for Kaufman service. The reputation for performing customized work, and the ability to competitively price and manufacture film-driven machines signifies that Kaufman may have been more accommodating to prospective customers than Lantech. However, this customer preference for Kaufman service does not tend to show that Lantech would not have made the sale had Kaufman not infringed. Had Kaufman not infringed on Lantech's patent rights, there would be no other supplier of film-driven prestretch machines that customers could prefer over Lantech.

■ The last reason cited merits more discussion. At trial, Lantech admitted that it would not have competed with Kaufman for the sale of machines to Kaufman distributors. Such sales accounted for at least nine infringing sales. The point is that if Lantech would not have been in competition for the sale, the inference that Lantech probably would have made the sale but for the infringement is an unreasonable one.

Lantech's admission that it would not have tried to make sales to Kaufman distributors does not automatically render the

17. *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed.Cir.1986) (quoting *Panduit,* 575 F.2d at 1162, 197 USPQ at 734). Lantech sustained its burden of showing that each customer desired the advantages of film-driven prestretch by merely showing that the customer chose to purchase a film-driven

prestretch machine instead of conventional or powered prestretch machines.

18. *Bio–Rad Laboratories,* 739 F.2d at 616, 222 USPQ at 663.

19. *Lam,* 718 F.2d at 1065, 219 USPQ at 675.

inference unreasonable. Lantech did present evidence indicating that a machine sold to a distributor is typically purchased by a third party within one year from the initial purchase. Therefore, it is quite possible that these infringing sales from Kaufman to its distributors ultimately resulted in infringing sales to customers. This end result effectively usurps Lantech's sale opportunities and therefore warrants lost profits damages.

However, the accuracy of this conjecture is insignificant. In *Gyromat*, we found "[t]he fact that [the patentee] bid against [the infringer] on only seven of the 152 infringing sales does not show that [the patentee] could not and would not have made those sales if [the infringer] had not infringed."[20] Thus, the fact that Lantech would not have competed for every infringing sale does not indicate that the inference that Lantech probably would have made the sale absent the infringement is unreasonable.

After examining the findings of fact and conclusions of law determined by the district court, we conclude that Kaufman did not establish that it is unreasonable to infer that the infringing purchasers probably would have purchased the patented machine absent the infringement.

### 6. Lost Profits Damages for Accessory Sales.

The district court awarded Lantech lost profits on spare parts that are typically concomitant with the sale of a patented film-driven prestretch machine. This award is not at issue in this appeal. Lantech does assert that the district court clearly erred by not awarding profits from lost plastic wrap sales. The trial court decided that the award would be speculative because Lantech did not present any evidence of profits gained from plastic wrap sales during the period of infringement.

In determining whether a patentee should be awarded lost profits on unpatented accessory sales, the deciding factor is whether the patentee could normally anticipate the sale of unpatented items as well as the patented ones.[21] There must be a reasonable probability that the patentee would have made the sale of the plastic wrap had the defendant not made the infringing sale.[22] The *Panduit* test is applicable to this issue.

Lantech did not present sufficient evidence to show that plastic film sales typically accompany the sale of a plastic stretch wrapping machine. Therefore, Lantech did not prove that there was a demand for Lantech's accessories. Furthermore, the district court found that Lantech provided no data concerning the amount of film sold to its customers who did purchase the patented machine. Therefore, Lantech failed to show the amount of profit the patentee would have made if the patentee had made the infringing sales. Consequently, Lantech failed to establish the first and fourth components of the Panduit test. The finding of the district court was not clearly erroneous.

### Prejudgment Interest Rate

The trial court awarded prejudgment interest to Lantech and initially set the interest rate at 7.87% to be paid from December 15, 1981 through January 30, 1989. Lantech, apparently dissatisfied with this rate, asked the court to raise the rate by amending the ruling pursuant to Rules 52(b) and 59(e).[23] The court obliged by raising the rate to 8.94%. Now, Lantech wants the rate raised again.

The ascertainment of the prejudgment interest rate is within the sound discretion of the district court.[24] The district court granted Lantech's request, and now Lantech wants more. We find no evidence that the district court abused its discretion by

---

**20.** 735 F.2d at 554, 222 USPQ at 8.

**21.** *Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 23, 223 USPQ 591, 599 (Fed.Cir.1984).

**22.** *Gyromat,* 735 F.2d at 554, 222 USPQ at 7.

**23.** Fed.R.Civ.P.

**24.** *Gyromat,* 735 F.2d at 557, 222 USPQ at 9–10.

setting the prejudgment interest rate at 8.94%.

## Conclusion

We reverse and remand this case for the district court to calculate and award to Lantech those profits lost on machine and spare part sales. In accord with the district court determination that infringement was willful, these damages shall be doubled. Prejudgment interest shall be awarded at a rate of 8.94% for the period from December 15, 1981 through January 30, 1989.

REVERSED–IN–PART, AFFIRMED–IN–PART, AND REMANDED.