**RISTVEDT–JOHNSON, INC., a Tennessee Corporation, and Cummins–Allison Corp., Plaintiffs,**

v.

**BRANDT, INC., a Wisconsin Corporation, Defendant.**

Civ. A. Nos. 88–C–3834, 91–CV–07016.

United States District Court,
N.D. Illinois, E.D.

Oct. 19, 1992.

Stephen G. Rudisill, Edward L. Foote, Robert J. Crawford, Chicago, Ill., for plaintiffs.

Thomas W. Ehrmann, David R. Cross, Milwaukee, Wis., Michael Zaleski, Madison, Wis., for defendant.

## MEMORANDUM OPINION

RADER, Circuit Judge, Sitting by Designation.

Plaintiffs, Cummins–Allison Corporation and Ristvedt–Johnson, Inc., (Cummins) sued Brandt, Inc. for infringement of several patents. These patents cover high-speed coin sorting machines. On October 1, 1991, after a lengthy trial, a jury concluded that Brandt had willfully infringed Cummins' three patents—U.S. Patent Nos. 4,098,280, 4,234,003, and 4,444,212. The jury awarded Cummins $5,338,973 in damages for infringement from May 1988 to March 1989.[1]

Brandt continued to infringe these same patents after the close of discovery in March 1989. The jury did not consider the infringement occurring from April 1989 to September 1991—a time frame also known as the "update period." In November 1991, Cummins filed a separate complaint, Civil Action No. 91–C–7016. In this action, Cummins alleged that a new Brandt coin sorter, the Mach 8, infringed the same three patents. Brandt agreed "that the issue of infringement with respect to the Mach 8 and the analysis thereof is no different than with respect to the Mach 10." Transcript of Proceedings, June 22–23, 1992, at 7. (Tr.) Therefore, with the parties' agreement, this court consolidated the November 1991 action with the trial of damages for the update period. In June 1992, this court held a two-day bench trial to determine damages accruing during the update period and for infringement by the Mach 8.

## DAMAGES

Section 284 of title 35 governs recovery of damages for patent infringement:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
>
> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
>
> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

35 U.S.C. § 284 (1988).

### Lost Profits

Proof of infringing sales does not automatically entitle a patent owner to lost profits. *Kaufman Co. v. Lantech, Inc.,* 926 F.2d 1136, 1141, 17 USPQ2d 1828, 1831 (Fed.Cir.1991). To recover lost profits, a patent owner must prove that, absent infringement, it would have made the infringer's sales. In other words, a patent owner must show that the infringement caused it to lose sales. In addition, a patent owner must provide sufficient evidence for computation of the profit loss. *Standard Havens Prods. v. Gencor Indus.,* 953 F.Supp. 549 (E.D.Ill.1992).

---

1. For additional background on this case, *see Ristvedt-Johnson, Inc. v. Brandt, Inc.,* 805

F.2d 1360, 1372, 21 USPQ2d 1321, 1331 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992); *see Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1322, 13 USPQ2d 1696, 1699 (Fed.Cir.1990). This evidence may take the form of lost sales, price erosion, or increased expenses. *Lam, Inc. v. Johns–Manville, Corp.,* 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983).

■ A patent owner need not prove patent infringement damages with absolute certainty. Rather, a patent owner need only show a reasonable probability that it would have made the sales. *Id.* If a patent owner is unable to determine the amount of damages with precision, the court resolves doubts against the infringer. *Id.*

■ To show that infringement caused the loss of profits, a patent owner may proffer evidence satisfying either one of two tests: a four-part test with origins in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156, 197 USPQ 726, 729–30 (6th Cir.1978), or the two-supplier market test. *Kaufman,* 926 F.2d at 1141. Sufficient evidence to satisfy either test creates an inference that the infringement caused lost profits. *Standard Havens,* 953 F.2d at 1372–73; *Lam,* 718 F.2d at 1065. If a patent owner satisfies both tests for causation, "the inference approaches conclusiveness." *Kaufman,* 926 F.2d at 1141.

Under the *Panduit* approach, a patent owner must prove (1) a demand for the patented product, (2) the marketing and manufacturing capability to exploit that demand, (3) an absence of acceptable noninfringing substitutes, and, (4) the amount of profit the patent owner would have made. *Standard Havens,* 953 F.2d at 1372–73. In sum, a patent owner has the burden to prove, by a preponderance of the evidence, *Yarway Corp. v. Eur–Control USA Inc.,* 775 F.2d 268, 275, 227 USPQ 352, 357 (Fed. Cir.1985), that but for the infringement it would have made the infringer's sales. *Bott v. Four Star Corp.,* 807 F.2d 1567, 1571, 1 USPQ2d 1210 (Fed.Cir.1986).

Under the two-supplier market test, the patent owner must show that the infringer was the only other supplier of the patented product. A patent owner need not nullify every possibility that a consumer might have purchased a different product or none at all. *State Indus. v. Mor–Flo Indus.,* 883 F.2d 1573, 1577, 12 USPQ2d 1026, 1028 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990).

■ Once a patent owner establishes an inference of lost profits due to infringement, the burden shifts to the infringer to show "it is unreasonable to infer that some or all of the infringing sales probably caused the [patent owner] to suffer the loss of profits." *Kaufman,* 926 F.2d at 1141–42. If a patent owner cannot prove entitlement to lost profits, it may recover no less than a reasonable royalty. *Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1543, 3 USPQ2d 1412, 1415 (Fed.Cir.1987).

*Brandt's Sale of the Mach 10*

The undisputed number of Brandt's Mach 10s, the comparable model to Cummins' JetSort, sold during the course of the update period is 668. Tr. at 91, 112; PTX–560, DTX–353.

■ This court next considers whether Cummins has satisfied its burden of proving causation. This court applies the four-part *Panduit* and two-supplier market tests. First, this court examines Cummins' evidence of compliance with the *Panduit* test for the update period:

1. Demand for the Patented Product.

The record evidence of Cummins' and Brandt's sales show an ample demand for the coin sorters. For this reason, the parties do not dispute sufficient demand for the patented product.

2. Capability to Exploit the Demand.

The parties agree that Cummins had sufficient manufacturing capability to meet the demand during the update period. The parties dispute, however, whether Cummins had sufficient marketing capability to exploit that demand. The chief executive

officer for Cummins, Mr. John E. Jones, testified that his company had approximately 100 salesman to market its products nationwide. Tr. at 173–174. Cummins' salesmen called upon the vast majority of Brandt's potential customers. PTX–105, see Tr. at 173–74.

■ The *Panduit* test does not require Cummins to prove it would have made the sales. It only requires Cummins to show the capacity to market its patented product to purchasers who bought the infringing product. Cummins need not prove that it actually competed for each infringing sale. *Standard Havens*, 953 F.2d at 1373.

Cummins had a sizeable force of trained salesmen who contacted the bulk of Brandt's customers. PTX–105. In sum, Cummins possessed the necessary marketing capability to accommodate an additional 668 Mach 10 sales during the update period.

### 3. Absence of Acceptable Noninfringing Substitutes.

■ To prove an absence of acceptable noninfringing substitutes, Cummins must show either that specific purchasers bought the patented product for its claimed advantages or that potential purchasers in the marketplace generally sought to buy the patented product for its advantages. *Id.* The existence of competing products does not necessarily make them acceptable substitutes. *TWM Mfg. v. Dura Corp.*, 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). To qualify as a substitute, a competing product should possess the beneficial characteristics of the patented product. *Kaufman*, 926 F.2d at 1142–43. In addition, disparately higher or lower prices, absent evidence of predatory pricing or other tampering with the market, would tend to show that a competing product is not a substitute for the patented product.

The patented product at issue is a coin sorting machine. In general terms, these machines allow an operator to pour a large quantity of assorted coins into a central hopper. The hopper funnels the coins onto the center of a rotating disc. The disc presses the coins against a guide plate. As the disc continues to rotate, the guide plate aligns the coins in single file against its outer edge or the peripheral limit guide. Coins move at high speed along this edge until released into a slot of the proper diameter. Thus, nickels find a nickel-sized slot, dimes a dime-sized slot, and so forth.

Once in the proper slot or exit guide, the coins move out of the sorter. Counting devices detect each coin as it passes out of the coin release guides. These machines can sort and count coins at a rate of 6,000 coins per minute. For like coins, the coin sorter can sort and count at rates up to 10,000 coins per minute. Cummins and Brandt generally sold these high speed coin sorters to companies which handle vast quantities of coins, such as casinos, banks, department stores, and transportation agencies.

Although a number of other machines sort coins with different (and often outdated) methods, the patented product uses "soft disc" technology. As already noted, the patented soft disc technology sorts with a rotating resilient rubber pad and a stationary annular guide plate. This innovative method sorts at extremely high rates of speed (up to 10,000 coins per minute), with excellent accuracy, and, due to essentially one moving part, with a fine record of reliability. Tr. at 184. None of the other "barrel," "drum," "core," "sieve," or "rail" sorters incorporate all these advantages. For instance, the core sorter processed coins at the slower rate of 600 per minute with less accuracy than the patented product. *Id.* The rail technology sorts up to 1,200 coins per minute with marginal accuracy and reliability. *Id.*

Even "hard" disc sorters do not enjoy the advantages of "soft" disc technology. Hard disc sorters deposit coins on a solid metal disc. In the 1970's, Brandt introduced its Model 960 hard disc sorter. The Model 960 could sort coins at a rate of 3,000 per minute. In addition, in the early 1980's, Brandt sold a Childers Corporation soft disc sorter capable of sorting 6,000 coins per minute. Brandt stopped selling

the Childers sorter in the mid–1980's before the time period involved in this suit.

Several other aspects of this case support a finding of an absence of noninfringing alternative coin sorters. For instance, sales of Cummins' patented product doubled after Brandt withdrew the Mach 10 from the market. PX–653. This dramatic increase is significant in light of generally poor economic market conditions. This evidence supports Cummins' claim that it would have made all of Brandt's infringing sales.

In addition, the record shows that Brandt did not design its own product. In fact, the jury determined that Brandt willfully infringed Cummins' patents.

Brandt argues Cummins' lost sales reports prove the existence of noninfringing alternatives to the patented product. *See* DX–280. Cummins indeed has a policy requiring its sales force to report sales lost to a competitor. Brandt contends that Cummins' failure to produce 668 lost sales reports, the number of Brandt's Mach 10 sales, shows that Cummins did not lose 668 sales to Brandt. Either reticence of the sales force to report their own failures, or reluctance of customers to tell Cummins' representatives of the choice of a competitor, could easily explain the reporting discrepancy. Brandt's contention does not suffice to overcome considerable convincing evidence of the absence of noninfringing alternatives to Cummins' patented coin sorter.

Brandt also attempted to rebut the causation inference with a survey allegedly showing Cummins' inability to make all 668 Mach 10 sales. DX–276. As noted by a particularly credible and helpful expert witness, Mr. Robert C. Sorenson, Brandt's survey contained too many flaws to support Brandt's conclusions. Without noting all the flaws, this court can summarize: The survey contained many inherent biases in the selection of the sampling pool, lacked objectivity in the introductory paragraphs, made repeated (and subtly suggestive) references to Brandt, and used other improper techniques for a scientific survey.

Moreover, the survey did not ask the most probative questions about availability of noninfringing alternatives. For example, question 5 from Brandt's telephone interview questionnaire asks:

If the Mach (8 or 10) had not been available at that time, would you have:

A. Bought another Brandt model

B. Bought another model from a different manufacturer

C. Done nothing at that point in time

D. Other Probe

DX–276.

This question does not inform the interviewee that Brandt had no other sorters with soft disc technology and that Cummins would continue to offer the patented technology. In fact, the entire questionnaire leaves the interviewee in the dark on this fundamental point. Furthermore, question 5 used the expression "at that time" with regard to the Mach 10's availability. This phrase suggests that Brandt could offer the Mach 10 in the future. This ambiguous phrase could also mislead.

In the absence of acceptable noninfringing alternatives to Cummins' patented technology, only Brandt and Cummins supplied the market with high-speed soft disc coin sorters. As mentioned above, when the patent owner and infringer were the only suppliers of the patented product, a court may reasonably infer under the *Panduit* test that the patent owner would have made the sales made by the infringer. *Lam,* 718 F.2d at 1065.

Having considered all the evidence, this court finds no acceptable noninfringing substitutes in the marketplace for Cummins' patented product. In reaching this finding, the court also assessed the credibility of the witnesses. This court determined that Cummins' witnesses provided a far more credible explanation of relevant market conditions.

Under the two-supplier market test, this court inquires into the availability of noninfringing products with the same beneficial characteristics of the patented product. *TWM,* 789 F.2d at 901. In this case, the patented product supplies speed, accuracy, and reliability in coin sorting. Brandt did

not point to any noninfringing products with those advantages.

Cummins, therefore, satisfied both the *Panduit* and the two-supplier market tests. This proof, in turn, justifies this court's inference that the infringing sales caused Cummins to lose profits. Brandt did not effectively rebut this inference. In fact, the inference approaches conclusiveness.

### 4. Calculation of Lost Profits.

■■ Cummins claims lost profits for the diverted sales. Specifically, Cummins seeks profits lost in sorter sales, maintenance contracts, billable services, and supplies. Because Cummins has proven it would have sold its product to the customers who bought Brandt's Mach 10, this court calculates lost profits for 668 coin sorters. In making this calculation, this court applies the incremental income method:

> The incremental income approach to the computation of lost profits is well established in the law relating to patent damages. The approach recognizes that it does not cost as much to produce unit N + 1 if the first N (or fewer) units produced already have paid the fixed costs. Thus fixed costs—those costs which do not vary with increases in production, such as management salaries, property taxes, and insurance—are excluded when determining profits.

*Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22, 223 USPQ 591, 599 (Fed.Cir.1984) (citations omitted). This approach thus instructs this court to determine Cummins' total sales revenue had it sold the 668 Brandt Mach 10s. Next, this court calculates Cummins' incremental cost percentage by determining its fixed and variable costs. The product of the total sales revenue for the 668 sorters and the incremental cost percentage yields the incremental costs Cummins would have incurred on the 668 sorters. Finally, subtracting these incremental costs from the lost sales revenue shows Cummins' lost profits.

*Total Lost Sales Revenue*

■■ Cummins' patented product, sold under the trade name "JetSort," was available during the update period in a number of different models. The basic model is the JetSort 1701. However, customers can purchase the 1701 with various options, such as printer, hopper, or locking doors. The options add to the price of each model. To properly account for options in calculating lost sales revenue, this court uses the average price of all JetSorts sold during the update period.

| Month/Year | Units | Avg. Selling Price | Net Sales |
|---|---|---|---|
| Apr–89 | 28 | $7,470 | $209,149 |
| May–89 | 16 | 7,851 | 125,614 |
| Jun–89 | 21 | 7,494 | 157,376 |
| Jul–89 | 30 | 7,549 | 226,480 |
| Aug–89 | 16 | 8,784 | 140,537 |
| Sep–89 | 20 | 7,645 | 152,906 |
| Oct–89 | 43 | 7,602 | 326,889 |
| Nov–89 | 13 | 6,945 | 90,279 |
| Dec–89 | 22 | 7,300 | 160,591 |
| Jan–90 | 31 | 7,103 | 220,192 |
| Feb–90 | 7 | 7,183 | 50,279 |
| Mar–90 | 38 | 6,648 | 252,608 |
| Apr–90 | 22 | 7,742 | 170,321 |
| May–90 | 49 | 7,183 | 351,951 |
| Jun–90 | 46 | 8,073 | 371,340 |
| Jul–90 | 19 | 7,354 | 139,729 |
| Aug–90 | 18 | 6,659 | 119,857 |
| Sep–90 | 21 | 7,339 | 154,127 |
| Oct–90 | 25 | 7,262 | 181,550 |
| Nov–90 | 13 | 7,685 | 99,905 |
| Dec–90 | 26 | 9,951 | 258,727 |
| Jan–91 | 22 | 8,421 | 185,265 |
| Feb–91 | 34 | 7,800 | 265,194 |
| Mar–91 | 23 | 7,489 | 172,242 |
| Apr–91 | 34 | 6,961 | 236,681 |
| May–91 | 11 | 6,627 | 72,896 |
| Jun–91 | 25 | 7,793 | 194,831 |
| Jul–91 | 21 | 7,460 | 156,665 |
| Aug–91 | 13 | 7,154 | 93,000 |
| Sep–91 | 22 | 8,062 | 177,371 |

DX–340. The average sales price for Cummins' JetSorts is thus $7,564. To learn the total lost sales revenue, this court multiplies the average sales price ($7,564) by the number of Brandt's infringing sales (668) for a total of $5,052,752.

■■ In addition to lost profits on machine sales, Cummins also claims lost profits for services related to the sale of the

patented product. Due to Brandt's infringement, Cummins seeks damages to compensate for profits it would have received from the sale of Preventative Maintenance Inspection Agreements (PMIAs), billable service, and supplies. PMIA contracts are one-year maintenance agreements normally purchased when a customer buys a coin sorter. Lost revenue associated with the billable services category includes maintenance calls on customers who have opted not to purchase the PMIA contract, i.e., a pay-as-required basis. The supplies category relates to items that customers purchase as a result of normal use, such as, sorter bags and pads. Tr. at 14.

The United States Court of Appeals for the Federal Circuit clarified the basis for this damages claim:

> [U]nder the "entire market value rule" it is the "financial and marketing dependence on the patented item under standard marketing procedures" which determines whether the non-patented features of a machine should be included in calculating compensation for infringement. The ultimate determining factor is whether the patentee or its licensee can normally anticipate the sale of the unpatented components together with the patented components.

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656, 225 USPQ 985, 989 (Fed.Cir.) (citations omitted), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). Based on the evidence presented credibly on this point by Mr. Jones and Ms. Kone, this court, following the standard set forth in *Kori*, awards damages for lost profits on repair services and PMIA contracts. *See also Micro Motion*, 894 F.2d at 1322. During the update period, Cummins sold PMIA contracts to 36% of Jetsort buyers. PX–623. Therefore, this court computes that Cummins would have sold PMIA service contracts to 240 of the 668 infringing sales. The average annual price for PMIA is $1,097. *See* PX–623. PMIA damage will be awarded for the entire update period—thirty months. The total lost sales revenue on PMIA contracts is $658,200.

Cummins claims lost profits on PMIA contracts for a five-year period. Cummins was free to market its repair services to Mach 10 purchasers, however, from the time of the jury verdict in October 1991. The infringing period in question is thirty (30) months, not five years. Therefore, this court awards no lost profits for repair services beyond the thirty months.

With regard to total sales revenue for billable services, Cummins showed that the average annual service revenue per machine is $351. *See* PX–623. Four hundred twenty eight (428) sorters would lack PMIA contracts and require such service. Thus the total lost revenue from billable services is $375,570 for the update period.

To calculate total revenue losses for supplies for the infringing units, this court multiplies lost revenue on machine sales by the average annual rate of supplies sales during the update period. This court accepts Cummins' credible evidence on this category of lost profits. PX–623. Cummins' average annual rate of supplies sales is 9%. *See id.* Thus, the total sales revenue for supplies for the update period is $454,747.

5. Incremental Cost Percentage.

■ To compute incremental costs, this court determines the cost for Cummins to manufacture and sell each additional sorter. These incremental costs apply to machine sales, PMIA contracts, billable services, and supplies. First, this court separates Cummins' cost of doing business into fixed and variable costs. Fixed costs, unlike variable costs, do not vary with increases in production. *Paper Converting*, 745 F.2d at 22. Management salaries, property taxes, and insurance are examples. Lost profits do not include these fixed costs. *Id.* Variable costs, on the other hand, vary with increases in production and, as such, figure into the lost profits calculation. Examples of variable costs are materials, labor, utilities, and postage.

a. *Incremental Cost on Machine Sales*

Cummins' incremental cost breakdown for machine sales includes: direct material

and labor; factory overhead; and selling, general and administrative. The parties do not dispute incremental cost calculations for the first two categories. Tr. at 18–19, 450. The parties only dispute the selling, general and administrative (SG & A) costs of machine sales. This category includes commissions, bonuses, field sales expenses, administrative supplies, and employment of an additional order entry clerk. PX–623.

Cummins' accounting expert, Ms. Kone, testified that the incremental cost of SG & A would have been only 18.39% of the total sales revenue. Brandt's expert, Mr. Goedde, would set that percentage at 36.-15%. PX–668. Both parties have presented plausible methods to estimate this variable cost. To arrive at a fair incremental cost percentage, this court will "split the difference between the two estimates advocated by [Cummins'] and [Brandt's] experts." *Minnesota Mining & Mfg. v. Johnson & Johnson, Inc.,* 976 F.2d 1559, 1579 (Fed.Cir.1992). On the basis of both parties' SG & A cost analysis, this court finds the appropriate incremental cost percentage for SG & A cost to be 27%.

| Percentage Incremental Cost: | April 1989—September 1991 |
|---|---|
| Direct Material and Labor | 35% |
| Factory Overhead | 5% |
| SG & A | 27% |
| Total | 67% |

Tr. at 14–33. Based on the calculations above, the total incremental cost for loss in sales of machines is $3,385,343.

### b. *Incremental Costs on PMIA*

PMIA incremental costs include labor, service manager's bonuses, and branch manager's commissions on maintenance contracts. Cummins presented credible testimony on this category of incremental costs. According to PX–623, the percentage incremental costs for the update period is 48%. The total incremental costs for PMIA contracts is $315,936.

### c. *Incremental Costs on Billable Services*

Billable services include the same items as PMIA for maintenance on products without the benefit of a PMIA contract. Cummins again presented credible evidence on this category of incremental costs. The incremental costs percentage for the update period is 48%. PX–623. The total incremental cost percentage for billable services is $180,273.

### d. *Incremental Costs on Supplies*

Supplies include replaceable parts of the coin sorters, like soft disc pads. Cummins also presented credible evidence on this category of incremental costs. The total incremental cost percentage for the update period is 46%. PX–623. The total incremental costs for supplies is $209,183.

Lost Profits from the Diverted Sales (Sales Revenue minus Incremental Costs):

| Item | Sales Revenue | Incremental Costs | Lost Profits |
|---|---|---|---|
| Machine Sales | $5,052,752 | $3,385,343 | $1,667,409 |
| PMIA | 658,200 | 315,936 | 342,264 |
| Billable Services | 375,570 | 180,273 | 195,297 |
| Supplies | 454,747 | 209,183 | 245,564 |
| Total | $6,541,269 | $4,090,735 | $2,450,534 |

### Price Erosion

In addition to lost profits from diverted sales, Cummins also claims lost profits from Brandt's price competition.[2]

---

**2.** Cummins' claim for price erosion on PMIA contracts is considered too speculative. There-

A patent owner may recover lost profits for price erosion by showing that the infringement caused the patent owner to charge lower prices than the market otherwise would have dictated. *Amstar,* 823 F.2d at 1543. In a market with only two viable competitors, a court may infer that the patentee would have charged higher prices but for the infringement. *Id.*

The record shows that Brandt and Cummins were the only two significant competitors in the market for soft disc coin sorters. Therefore, this court may reasonably infer that Cummins could have charged higher prices but for Brandt's infringement. Indeed the record amply supports this inference for the update period. After the jury's verdict in 1991, sales of the JetSort doubled. Without competition from Brandt, Cummins also raised its prices at this time. Within several months after the verdict, Cummins increased its prices by 10%. Tr. at 170. This evidence from a period without competition from Brandt supports the inference that Cummins could have sold its patented product at prices similar to Brandt's higher prices.

The average unit price for the Cummins product during the update period was $7,564. During that time, Cummins sold 729 JetSorts. Tr. at 433–34. The evidence shows Cummins could have sold its patented product at a rate 19% higher than the average sales price. Tr. at 140.

Summary of Price Erosion Damages:

| | Units | % Price Erosion | Lost Profits |
|---|---|---|---|
| Cummins Sales | 729 | 19% | $1,047,573 |
| Brandt Sales | 668 | 19% | $ 959,916 |
| Total | | | $2,007,489 |

*Mach 8 Damages*

██ As previously mentioned, Cummins filed a separate action for infringement by Brandt's Mach 8 coin sorter. For purposes of this damages trial, the parties have agreed that this court should apply the jury's infringement verdict to the Mach 8. Brandt sold 885 infringing Mach 8's. PX–626.

The Mach 8 is a smaller version of the Mach 10. The capacity of the Mach 8 to sort coins is significantly less than the larger Mach 10. Both parties market two versions of coin sorters using the soft disc technology, a large and small model. Cummins sells its smaller coin sorter under the trade name "MiniSort." Cummins' smaller coin sorter, the MiniSort, differs from the Mach 8 in several respects. The MiniSort has a sorting speed of 3,000 to 5,000 coins per minute depending on the mixture of coin denominations and sells for about $4,000. The Mach 8 sorts up to 6,000 coins per minute and sells for about $5,000. Tr. at 49.

Cummins claims it would have made all of Brandt's Mach 8 sales. The record does not support this claim. After the October 1991 jury verdict, sales of the JetSort, Cummins' larger model, soared. In fact, JetSort sales approximately doubled. The MiniSort did not experience a similar increase in sales. MiniSort sales remained roughly the same after the verdict.

The evidence before this court suggests a possible rationale for this occurrence. First, Brandt customers who would have purchased the Mach 8 may have opted to buy the JetSort, not the MiniSort.[3] The Mach 8's sorting capability falls somewhere between the MiniSort and JetSort. Customers perhaps chose to buy the JetSort, a model with as great or greater capacity, as a replacement for the Mach 8. Second, Brandt customers may have purchased other coin sorters which did not use the patented technology. This rationale is not in conflict with the court's previous no acceptable noninfringing substitute determination for the JetSort. Although no other technology provides the speed, accuracy, and dependability of the soft disc JetSort,

fore, on this record, this court declines to award price erosion on PMIA contracts.

**3.** This finding that some potential Mach 8 customers may have bought JetSorts does not conflict with the finding that Cummins would have made all 668 Mach 10 sales based in part on the doubling of Cummins' sales upon withdrawal of the Mach 10 from the market. The doubling of JetSort sales shows both that potential Mach 10 and some Mach 8 buyers would prefer JetSorts in a market with no other acceptable alternatives.

the MiniSort—a machine with less speed and capacity—may have acceptable substitutes. A customer with reduced demands for speed may have purchased a slower noninfringing coin sorter technology instead of the soft disc MiniSort. Customers in need of speedy coin sorting, however, had no alternative to the JetSort once Brandt left the market.

■ This court finds that Brandt's sales of the Mach 8 did not entitle Cummins to lost profits damages. Instead Cummins is entitled to a reasonable royalty. 35 U.S.C. § 284 (1988). A reasonable royalty is the amount a licensee would be willing to pay for the right to make, use, or sell a patented article and yet make a reasonable profit. *Trans–World Mfg. v. Al Nyman & Sons,* 750 F.2d 1552, 1568, 224 USPQ 259, 269 (Fed.Cir.1984).

The Federal Circuit directs use of the "hypothetical negotiation" approach to calculate a reasonable royalty. *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed. Cir.1988). This approach supposes a licensing negotiation between a willing licensor and willing licensee.

■ The parties presented evidence far apart on what constitutes a reasonable royalty for the patented technology. Cummins suggests a royalty in the range of 25% to 40%. Brandt believes it would not have paid more than a 6.7% royalty. This scenario is unfortunate but typical. This court must decide what constitutes a reasonable royalty after careful review of the unique circumstances pertinent to this case. In particular, this court reviews, among other factors, the number of competitors in the market, the size of the market, Cummins' research investment, the remaining life of the patent, and the significance of the advance made by the patented invention in the field.

Testimony by Mr. Jones provides insight into the weight this court should give to these factors. The market for coin sorters is relatively small. Tr. at 174. As previously mentioned, several businesses, e.g., banks, rely heavily on high speed coin sort-ers. The number of competitors in this specialized market is also small.

The soft disc coin sorter technology significantly advanced this art, providing increased speed, higher accuracy, and excellent reliability. Finally, Cummins purchased this technology from the inventor at a substantial cost. Tr. at 175. In fact, Mr. Jones testified it would take approximately 10% of sales to recoup their engineering development investment to produce the patented technology. Tr. at 179.

With these factors in mind, the court recognizes that both parties would have made compromises in a "hypothetical negotiation." Upon realizing that Cummins had already invested an amount equal to 10% of sales to produce the product, Brandt would have agreed to its proposed royalty of 6.7% on top of Cummins' fixed costs of 10%. Therefore, the parties would have likely arrived at a royalty rate of 16.7%—less than Cummins wanted, more than Brandt wanted. Therefore, the royalty damages, *see Fromson,* 853 F.2d at 1574, would be:

| Item | Units Sold | Unit Price | Royalty Rate | Total |
|---|---|---|---|---|
| Mach 8 | 883 | $5,232 | 16.7% | $771,515 |

DTX–307.

### Prejudgment Interest

■ The allowance of prejudgment interest is the rule in patent infringement cases. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1250, 9 USPQ2d 1913, 1931 (Fed.Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). Section 284 of title 35 expressly provides for the award of interest in patent infringement cases. The United States Supreme Court stated that the award of prejudgment interest reflects the Act's provision of complete compensation for the patent owner. *General Motors Corp. v. Devex Corp,* 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). Generally, prejudgment interest extends from the date of infringement to the date of judgment.

This court may weigh factors which justify the denial of prejudgment interest. *Radio Steel & Mfg. v. MTD Prods., Inc.,* 788 F.2d 1554, 1558, 229 USPQ 431, 434 (Fed. Cir.1986). One factor to consider is dilatory action during discovery. This court

finds Cummins has acted in good faith during the litigation of this case and, therefore, should receive prejudgment interest.

Under this standard, this court awards prejudgment interests to Cummins at the prime rate compounded annually for the period of infringement to the date of this court's judgment. Cummins will submit its prejudgment interest calculations within ten days of the date of this judgment. These calculations should include updated interest on the jury damage award as well as interest on damages for the update period and for the Mach 8.

### Enhanced Damages

 Cummins requests this court to increase the damages by up to three times. Enhanced damages deter willful patent infringement by punishing the willful misconduct. *Avia Group Int'l Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1566, 7 USPQ2d 1548, 1555 (Fed.Cir.1988). Pursuant to 35 U.S.C. § 284, a district court has discretion to award enhanced damages. *See, e.g., Underwater Devices Inc. v. Morrison–Knudson Co.*, 717 F.2d 1380, 1390, 219 USPQ 569, 576–77 (Fed.Cir.1983). In exercising this discretion, this court should consider: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; and (3) the infringer's behavior as a party to the litigation." *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed.Cir.1986).

In the September 1991 trial, the jury determined that Brandt willfully infringed Cummins' patents. In making that determination, the jury had before it evidence that Brandt's management worried that Cummins' new coin sorter would take the lead in the market. The jury had evidence that one Brandt district manager wrote to Brandt's management expressing serious concern that Brandt could not compete with Cummins' new technology. PX–105, 129. The jury also examined closely and heard repeated references to a memorandum referring to an order from Brandt's management to produce "a Chinese copy of the Cummins JetSort." PX–129. Finally, the jury examined Brandt's accused product to determine if Brandt was guilty of copying.

In reaching its determination, the jury did not consider legal opinions prepared by Brandt's patent counsel, Mr. Thomas W. Ehrmann. When Brandt proffered this evidence, Mr. Ehrmann had already been extensively involved in presenting Brandt's case to the jury. To avoid the difficulties of permitting trial counsel to testify, this court reserved for its own review Mr. Ehrmann's opinions to Brandt management.

After considering all evidence, including Mr. Ehrmann's opinions, this court declines to award enhanced damages. This court exercises its discretion based on the following evidence. First, Brandt sought and followed oral and written opinions of competent counsel about Cummins' patents many years before Cummins marketed its JetSort in 1983. DX–123. *See American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 465, 227 USPQ 299, 302–03 (Fed. Cir.1985). Brandt continued to seek legal advice up to the time Cummins filed its initial complaint. DX–155, 169, 171, 173, 190. The opinions specifically address the patents involved in this lawsuit. The opinions show that Brandt sought legal advice from at least two law firms. The opinions advised that Cummins' patents had vulnerabilities to an invalidity attack and that Brandt's products did not infringe. The opinions of counsel carefully considered the patents themselves as well as their prosecution histories.

Second, Brandt evinced its confidence in its attempt to design around Cummins' patents by filing a patent application of Adams and Winkelman on March 27, 1987, for a "Resilient Disk Coin Sorter." DX–173. *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 866–67, 226 USPQ 402, 411–12 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236, 224 USPQ 418, 424

(Fed.Cir.1985); *Amstar*, 823 F.2d at 1546–47.

Finally, Brandt has acted in good faith during the course of this litigation. It presented its defenses to allegations of patent infringement in an aggressive yet fair manner. Brandt advanced no frivolous arguments. Most important, Brandt, without intervention of this court, unilaterally withdrew its products from the market upon receipt of the jury's verdict. Based on these circumstances, this court declines to award enhanced damages.

### *Attorney Fees*

■ Cummins claims attorney fees pursuant to 35 U.S.C. § 285. According to the statute, this court may award reasonable attorney fees to the prevailing party in "exceptional cases." This court finds nothing exceptional about this case in the meaning of section 285. Brandt has not acted or espoused positions frivolously. For many of the same reasons this court denied enhanced damages, it also denies Cummins' request to award attorney fees.

### CONCLUSION

In accordance with the foregoing opinion, this court awards plaintiffs the following damages:

(1) $5,338,973 for Mach 10 infringement occurring between May 1988 and March 1989. This figure is the total of the jury's damage award, $3,894,000, plus interest. By order of this court, the parties shall recompute the interest on $3,894,000 to account for the date of this judgment.

(2) $4,458,023 for Mach 10 infringement during the update period—April 1989 to September 1991.

(3) $771,515 for Mach 8 infringement.

The parties shall calculate interest on these amounts and report a total amount of damages to this court in accordance with its instructions.

IT IS SO ORDERED.