NATIONAL RESEARCH LABORATORIES, Plaintiff,

v.

EPPERT OIL COMPANY, INC., Defendant.

No. C–3–94–465.

United States District Court, S.D. Ohio, Western Division.

March 27, 2000.

Charles H. Walker, Columbus, OH, Frederick J. McGavran, Frost & Jacob, Cincinnati, OH, for Plaintiff.

Alfred L. Patmore, Jr., West Columbia, SC, for Defendant.

**DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES (DOC. # 88)**

RICE, Chief Judge.

This litigation was filed on November 8, 1994, by National Research Laboratories ("NRL") and Coolant Control, Inc. ("CCI"), alleging infringement of a number of patents held by Plaintiffs (Doc. # 1).[1] A detailed summary of the procedural history of this lawsuit was set forth in this Court's Decision of September 28, 1998 (Doc. # 76)(granting Defendant's motion for attorney fees and costs), and the Court will assume the parties' knowledge of that history. Pending before the Court is Defendant's Motion for Partial Summary Judgment on Damages (Doc. # 88). For the reasons assigned, Defendant's Motion is SUSTAINED IN PART AND OVERRULED IN PART. Before turning to Defendant's specific arguments, the Court will first set forth the factual circumstances leading to this litigation, and the standards governing all motions for summary judgment.

**I. Factual Background**

Plaintiff NRL, an Ohio corporation, is engaged in the business of developing, inventing, marketing, selling and licensing of certain chemical research and methodology.[2] Between 1977 and 1979, NRL was issued three United States patents for compositions and methodology (4,055,655; 4,126,509; 4,180,473), involving metalworking fluids.[3] The claims of all three patents are involved in this litigation (A.Compl., Doc. # 32). All three NRL patents were exclusively licensed to CCI.

Dr. Gerald Maurer started CCI to market and develop products using NRL's patents.[4] In 1975, NRL and CCI entered into a exclusive license agreement, whereby CCI was authorized to use its patents in the development and marketing of products for sale to the metalworking industry. The agreement provided that NRL would receive a royalty in the amount of 75% of CCI's net income.[5] In 1990, the shareholders of CCI were bought out by an

---

1. In September, 1996, CCI notified its Co-Plaintiff of its intent to withdraw as Plaintiff from the litigation. On February 12, 1997, CCI moved this Court to dismiss its complaint against NRL (Doc. # 23). By notation order, that motion was sustained. On February 19, 1997, NRL requested leave to amend its complaint, dismissing a claim regarding the Rossmoore patent, which was the subject of arbitration between NRL and CCI (Doc. # 25). As a result of these actions, NRL and Eppert are currently the only parties to this litigation.

2. Based on the memoranda submitted by the parties, the following facts are undisputed. (Doc. # 88, Doc. # 90).

3. Metalworking fluid functions to lubricate and cool various metallic surfaces during metalworking operations. The first patent (4,055,655) is for an antimicrobial agent comprised of a metal complex (disodium monocopper (II) citrate), which is effective at destroying microorganisms that grow in metalworking fluids. The second patent (4,126,509) is for compositions and methods of stabilizing metalworking fluid compositions to increase their service life. The metalworking fluids are stabilized by the addition of a metal complex, disodium monocopper (II) citrate. The third patent (4,180,473) is for a method of transporting metal ions by introducing a metal complex, disodium monocopper (II) citrate.

4. NRL's draft statements of stipulated facts state, "[i]n 1981, Dr. Maurer started a company called Coolant Control to market and develop products using the NRL patents." (Doc. # 88, Ex. A ¶ 7). Eppert has accepted that statement, as indicated by the fact that it cites to that statement in its memorandum in support of its motion for partial summary judgment (Doc. # 88, p. 2). However, NRL states in its memorandum in opposition to Defendant's motion that Dr. Maurer and Mr. Al Katona originally formed CCI in 1974, and that NRL originally licensed its patents to CCI in October of 1975 (Doc. # 90, Ex. A and Ferraris Aff. ¶ 8).

5. CCI's net income was calculated by deducting CCI's normal operating expenses from its gross income, including sublicensing income (Doc. # 90, Ex. A ¶ 9).

acquisition corporation, which transferred those shares to Mr. Jorge Costa and NRL. A new corporation was formed under the CCI name. To finance the buy-out of the "old" CCI and form the "new" CCI, NRL borrowed approximately 1.3 million dollars. During the same year, NRL entered into a license agreement with CCI, whereby CCI was granted a new exclusive license to use NRL's patents in the development and marketing of products for sale to the metalworking industry. The royalty rate for that license was 99% of CCI's net income on all products sold by CCI using NRL's patents. The agreed upon royalty rate was designed to assist NRL in securing a bank loan and to allow that company to avail itself of the benefits of certain provisions and sections of the United States tax code.

Pursuant to the license agreement, CCI manufactured and sold a line of products, known as OXCEDOT, which were used as additives to metalworking fluids. OXCEDOT is a trade name for the chemical complex, monocopper citrate ("MCC"). CCI also used NRL's patents to manufacture, sell and provide metalworking fluid treatment services, known under the service mark OXCEDOT TREATMENT SYSTEM, which used OXCEDOT. The service included an initial sample analysis of a customer's coolant, a process which involved between ten and fifteen tests. Treatment of the metalworking fluid might include adding active and ancillary ingredients, filtration, skimming out contaminants and pH adjustments. Between 1989 and 1994, CCI routinely sold its OXCEDOT TREATMENT SYSTEM in conjunction with NRL's patented monocopper citrate process and method. However, CCI offers its maintenance service and OXCEDOT product as separate items to its customers.

Defendant Eppert is a chemical blender, formulator, and compounder of chemical products located in the state of Michigan. Among Eppert's more successful products is a manufacturing cutting fluid emulsifier sold under the trade name "T–Cool." Un-like OXCEDOT, T–Cool is not a fluid additive; rather, it is the actual cutting fluid, which is used to cool and lubricate metal parts as they are being cut in metal cutting machines. Between 1989 and 1995, Eppert manufactured, sold and distributed a total of 4,045 gallons of a product known as KMMO. Eppert distributed KMMO as an anti-odor agent. Defendant has not manufactured or distributed KMMO since 1995. NRL contends that Eppert manufactured, sold and distributed KMMO as a clone or knock-off of OXCEDOT, which violates one or more claims of NRL's patents involving that product.

## II. Standards Governing Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 486, 106 S.Ct. 1348 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reason-

ably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Defendant's Motion for Partial Summary Judgment (Doc. # 88)*

■ 35 U.S.C. § 284 provides that, upon proof of infringement, "the court shall

award [the patent owner] damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." The phrase "damages adequate to compensate" means "full compensation for 'any damages' [the patent owner] suffered as a result of the infringement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Grain Processing Corp. v. American Maize–Prods.*, 185 F.3d 1341, 1349 (Fed.Cir.1999). Damage awards fall within two general categories, to wit: (1) actual damages, *e.g.*, lost profits, and (2) when actual damages cannot be established, a reasonable royalty. An award of damages may be split among both categories if necessary to compensate the patent owner fully. *See State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed.Cir.1989).

NRL has asserted that it has suffered actual damages in that it has incurred: (1) lost income from CCI's loss of direct sales of its OXCEDOT products, (2) lost income as a result of CCI having been forced to reduce the price of its OXCEDOT TREATMENT SYSTEM and other service contracts, and (3) lost income from CCI's loss of sales of related, non-patented products (Doc. # 90 at 2). Plaintiff contends that, because Eppert's KMMO is a substantially similar product to OXCEDOT, Eppert's KMMO customers would have purchased CCI's OXCEDOT, its maintenance service, and other unpatented copper-based products in lieu of the alleged infringing product, and that CCI would not have been forced to reduce the price of its maintenance services. NRL also has asserted, in the alternative, that it can establish a reasonable royalty rate of between 75% and 99%.

Defendant seeks summary judgment with regard to Plaintiff's claims for damages in this action.[6] It argues that NRL cannot establish any actual damages based upon the following four reasons. *First*, Defendant asserts that NRL cannot establish lost profits from Eppert's KMMO distribution. *Second*, Defendant argues that NRL is not entitled to any damages on CCI's maintenance service. *Third*, Eppert contends that market competition caused CCI's service price reductions. *Fourth*, it argues that Plaintiff is not entitled to even a partial recovery on its unpatented products. With regard to a reasonable royalty rate, Defendant argues that NRL is not entitled to a 99% royalty rate, because that rate has not been established by its license agreement with CCI. Thus, Eppert argues, NRL is entitled only to a reasonable royalty rate, as a matter of law. As a means of analysis, the Court will first address Defendant's arguments regarding Plaintiff's claims for actual damages, discussing the second and third arguments together, and will then turn to Eppert's argument concerning a reasonable royalty rate.

### A. Actual Damages

■ In order to receive lost profits, a successful plaintiff must establish actual damages. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed.Cir.1996). "Proof of actual damages must include a causal connection between the infringement and the lost profits. 'To recover lost profits as actual damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales.'" *Id.* (citations omitted). A prevailing patent owner may recover any foreseeable lost profits that it can prove. *Grain Processing Corp.*, 185 F.3d at 1349; *see Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545–47 (Fed.Cir.1995).

### 1. Lost Profits from Direct Sale of OXCEDOT due to KMMO Distribution by Eppert

In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978),

---

**6.** The Court notes that there has been no stipulation, settlement, court ruling, or any other determination with respect to the validity of NRL's patents or whether Eppert in fact infringed upon those patents.

the Sixth Circuit articulated a four-factor test for a patentee to prove entitlement to lost profits for a device covered by the patent in suit.[7] As stated by the court in *Rite–Hite* :

> The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's prima facie case with respect to "but for" causation. A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringement. When the patentee establishes the reasonableness of this inference, *e.g.*, by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales.

56 F.3d at 1545 (citations omitted). In applying the *Panduit* test, the district court must "ascertain whether [the patentee's] products competed for the same customers, whether the market included acceptable noninfringing substitutes, and whether [the patentee] had the capacity to exploit the demand." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed.Cir.1996). Satisfaction of the *Panduit* factors allows the district court to reasonably infer that the claimed lost profits were caused by the infringing sales. *Biacore, AB, v. Thermo Bioanalysis Corp.*, 79 F.Supp.2d 422, 469 (D.Del.1999)(citing *Rite–Hite*, 56 F.3d at 1545). The same inference is possible upon a showing that the patentee and the infringer are the only suppliers present in the market. *See Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed. Cir.1991). Herein, Defendant asserts that NRL cannot satisfy first two prongs of the *Panduit* test.

*First*, Defendant argues that NRL cannot satisfy the first prong of the *Panduit* test. Specifically, Defendant argues CCI and Eppert do not compete in the same marketplace or for the same customers. Eppert argues that it never intended to profit from the distribution of KMMO, and that KMMO was given away or sold to customers to control odor, not to be a cutting fluid stabilizer and emulsifier, as was NRL's OXCEDOT. Thus, Eppert essentially argues that NRL would not have made any additional sales had it (Eppert) not distributed KMMO. In response, NRL states that Eppert prevented it from making sales it otherwise would have made, because Defendant sold some of its product to the end-user. Plaintiff states that "KMMO was effective in destroying the odor-causing bacteria by virtue of its anti-microbial activity. The [sic] KMMO did compete with OXCEDOT." (Doc. # 90 at 9).

> The first *Panduit* factor—demand for the patented product—presupposes that demand for the infringer's and patent owner's products is interchangeable. Under this assumption, evidence of sales of the infringing product may suffice to show *Panduit*'s first factor "demand for the patented product." This analysis assumes that the patent owner and the

---

7. Although accepted as a useful test for determining lost profits for a device covered by the patent at issue, the *Panduit* test is not the exclusive means for determining whether actual damages should be awarded. *Rite–Hite*, 56 F.3d at 1548 ("It there are other ways to show that the infringement in fact caused the patentee's lost profits, there is no reason why another test should not be acceptable." "Moreover, other fact situations may require different means of evaluation, and failure to meet the *Panduit* test does not ipso facto disqualify a loss from being compensable.").

infringer sell substantially the same product. In *Gyromat [Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed.Cir.1984) ], for instance, the patent owner's and the infringer's products were similar in price and product characteristics. If the products are not sufficiently similar to compete in the same market for the same customers, the infringer's customers would not necessarily transfer their demand to the patent owner's product in the absence of the infringer's product. In such circumstances, as in this case, the first *Panduit* factor does not operate to satisfy the elemental "but for" test.

*BIC Leisure Prods. v. Windsurfing Internat'l, Inc.*, 1 F.3d 1214, 1218–19 (Fed.Cir. 1993) (citations omitted). In support of its argument that the parties did not compete, Defendant has cited to the deposition of Gary Edwards, in which he testified that KMMO was not distributed to any of its customers for any reason other than to control odor, and that it was not distributed as a fluid stabilizer (Edwards Dep. at 83). As evidence that the parties did in fact compete, Plaintiff cites to conclusory statement in the affidavit of Garry Ferraris that, "[b]etween 1989 and 1994, CCI and its [OXCEDOT] products competed with Eppert, and its KMMO product, for sale to the end-user." (Ferraris Aff. ¶ 6).[8]

The parties have stated that OXCEDOT contained from 40 to 50 units of activity (40–50 mg of monocopper citrate per milliliter)(NRL stip. fact ¶ 39), which Eppert asserts equates to a concentration of copper approximately ten times more concentrated than contained in KMMO (Eppert stip. fact ¶ 14). Eppert has provided undisputed evidence that KMMO was marketed solely as an anti-odor agent, while OXCEDOT was marketed as an antimicrobial fluid stabilizer and emulsifier.

In addition, the parties have provided evidence that CCI and Eppert generally do not compete against each other, and that only a limited number of Eppert's sales of KMMO went to common customers of both, namely the "end-users." According to Mr. Ferraris, Eppert sold its product to large automotive manufacturers and some "end-users." CCI's general customer base consists of the blender/formula/compounder, who was Eppert's competition (Ferraris Dep. at 143). According to Mr. Ferraris, between 1989 and 1994, the parties competed only with regard to end-users (Ferraris Aff. ¶ 44). Such undisputed evidence strongly suggests that, even assuming that KMMO and OXCEDOT contained the same composition and differed only in molar concentration (strength of the composition), they were sufficiently dissimilar, *i.e.*, KMMO competed with anti-odor agents, as opposed to OXCEDOT, and, with the exception of end-users, competed in different markets.

■ However, NRL has also stated that one company (Castrol), to which CCI and Eppert both provided products, did not purchase OXCEDOT, because it was provided with Eppert's KMMO in addition to T–Cool.[9] The fact that Castrol did not purchase OXCEDOT while it was provided KMMO, but began to purchase NRL's product after Eppert ceased distributing KMMO raises a genuine issue of material fact as to whether parties' products were interchangeable in the eyes of the customers that they had in common.

As stated above, NRL has directed the Court to one customer which had declined to purchase OXCEDOT as a result of using Eppert's products. In his affidavit,

---

8. NRL also cites to paragraph 74 of its draft stipulation of facts, which states that KMMO stabilized emulsions and exhibited antimicrobial activity; however, the Defendant has not agreed to that draft stipulation.

9. In its reply memorandum, Defendant states that it did not sell directly to Castrol. Rather,

Eppert had a contract with Castrol to provide T–Cool coolant to the General Motors manufacturing plant in Ypsilanti, Michigan (Edwards Aff. ¶ 4). T–Cool and KMMO were shipped to and stored at the plant, and plant personnel applied KMMO to the coolant systems (*id.* ¶ 11).

Mr. Ferraris states that CCI attempted to sell OXCEDOT and its treatment program to Castrol in 1990 (Ferraris Aff. ¶ 46). Castrol did not purchase CCI's products at that time, stating that it was purchasing T–Cool and was supplied KMMO by Eppert (id.). Mr. Ferraris further stated that, after Eppert ceased to supply KMMO to Castrol, that company began to purchase CCI's copper-based products. Beyond the Castrol account, the Court is unable to determine the number of customers for which CCI and Eppert competed. Defendant has stated that the majority of its KMMO was distributed to those of its customers who were not also customers of CCI, *i.e.*, the Big Three automakers.[10] However, Eppert has not directed the Court to evidence in support of those statements. Accordingly, the Court concludes there is a genuine issue of material fact as to whether Eppert and CCI competed for sales of its products to its common customers and, therefore, a genuine issue of material fact exists as to whether Plaintiff can satisfy the first prong of the *Panduit* test, with respect to the common customers.

■ *Second,* Defendant argues that various non-infringing substitutes were available. "[R]econstructing the market, by definition a hypothetical enterprise, requires the patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and the likely outcomes with infringement factored out of the economic picture." *Grain Processing*, 185 F.3d at 1350. As with the first *Panduit* factor, "the second Panduit factor—absence of acceptable, noninfringing alternatives—presupposes that the

patentee and the infringer sell substantially similar products in the same market. To be acceptable to the infringer's customers ..., the alleged alternative 'must not have a disparately higher price than or possess characteristics significantly different from the patented product.'" *BIC Leisure,* 1 F.3d at 1219 (*citing Kaufman Co.,* 926 F.2d at 1142).

Eppert focuses on the availability of odor-controlling products, arguing that a number of non-copper based anti-microbial, anti-odor agents have been freely available on the open market. In contrast, NRL contends that there were no acceptable non-infringing anti-microbial agents on the market during the period of infringement. As noted by Plaintiff, Mr. Ferraris testified that a number of people have tried to market copper-based products that would have been competitive (Ferarris Dep. at 110). He testified that Cupramine, manufactured by Nelson Chemical, could have been considered a competitive product, stating, "we marketed against their product head to head in the marketplace and were able to convince the customer base that had an interest in their product that our product was superior to theirs." (Ferraris Dep. at 111) Mr. Ferraris further stated that CCI now owns the rights to Cupramine, but that it does not market it, because that product does not work (*Id.* at 112).

Construing the evidence in the light most favorable to Plaintiff, that party has raised a question of fact as to whether an acceptable, non-infringing alternative to OXCEDOT was available.[11] However, viewing the market from the perspective of Eppert's customers, as the *Panduit* test requires, *e.g., BIC Leisure Prods.,* 1 F.3d at 1219 (analyzing whether the alleged al-

---

10. The report of Defendant's expert, William Stein, states that Eppert's four major customers accounted for 3,115 of the 4,046 gallons of KMMO distributed, leaving a very small quantity of KMMO that could have been distributed to CCI customers. However, Defendant has not directed the Court to sworn testimony to support that calculation.

11. According to Gary Edwards, CCI asserted in presentations that OXCEDOT was more than an anti-odor agent, and that it improved tool life, improved the condition of the coolant, and improved surface finishes on parts. (Edwards Dep. at 20–21).

ternatives would be acceptable to the infringer's consumers), there were a number of alternatives to the alleged infringing product. The uncontroverted evidence indicates that a number of non-copper based anti-microbial, *anti-odor* agents were available on the market. Other than the attempted sale to Castrol, NRL has not directed the Court to any evidence that KMMO was distributed in the same market in which OXCEDOT is distributed. In addition, the uncontroverted evidence indicates that Eppert marketed KMMO solely to control odor, and NRL has not provided any evidence that customers sought KMMO for a reason other than odor control. Moreover, there is no evidence that OXCEDOT was purchased by CCI's customers solely for the purpose of controlling odor. Accordingly, even assuming that KMMO was an infringing product for OXCEDOT, NRL has provided no evidence that KMMO customers, other than Castrol, would have purchased OXCEDOT (a fluid stabilizer and emulsifier) had KMMO (a product marketed as an odor-controller) not been available. (*See* Ferraris Dep. at 144–48)[12] Although Plaintiff has raised a genuine issue of material fact as to whether it would have sold OXCEDOT to Castrol had KMMO not been on the market, it has not raised a genuine issue of material fact as to any other Eppert customer.

Based on the foregoing, NRL has not demonstrated that it can satisfy the *Panduit* test as to any customer other than Castrol. Accordingly, NRL has not raised a genuine issue of material fact as to whether any other Eppert customers would have purchased OXCEDOT in lieu of KMMO, had Defendant's product not been available. Thus, with the exception of Castrol, Defendant is entitled to sum-

mary judgment on Plaintiff's claim for lost profits on the sale of OXCEDOT, due to Defendant's providing of KMMO to its customers. Because there is a genuine issue of material fact as to whether CCI lost sales of OXCEDOT to Castrol as a result of the provision of KMMO to that entity, Eppert's Motion for Summary Judgment is OVERRULED with respect to that customer. In sum, Defendant's Motion for Summary Judgment on Plaintiff's claim for lost profits from the sale of OXCEDOT is SUSTAINED IN PART AND OVERRULED IN PART.

### 2. *Lost Profits on CCI's Maintenance Service*

Defendant asserts that NRL should not recover damages for lost profits on CCI's maintenance service. *First*, Eppert argues that CCI, not NRL, offered the maintenance service and, therefore, NRL cannot have lost profits. *Second*, it asserts that Eppert did not offer a service similar to CCI's maintenance service. *Third*, Defendant argues that CCI's maintenance service was an unpatented product and that under the entire market value rule, Plaintiff cannot recover for the lost profits from that service.

■ With regard to Defendant's *first* argument, NRL has provided evidence that OXCEDOT products were usually included in CCI's maintenance service (Ferraris Aff. ¶ 34). In addition, CCI maintenance service was sold separately from the OXCEDOT product only "to a small extent" (Ferraris Aff. ¶ 36). CCI's OXCEDOT TREATMENT SYSTEM was never sold separately from the OXCEDOT product (Id.¶ 27). Because OXCEDOT was normally sold as part of CCI's mainte-

---

12. Q. So there have been some lost customers [to Eppert, in addition to Castrol], but we're not sure who they are?
A. I think there are some more fairly insignificant compared to Castrol.
Q. Okay. And do you have any knowledge of how they were lost to Eppert's KMMO?
A. No.
Q. Do you have any knowledge of any reasons that Coolant Control lost them?
A. No.
Q. Is it possible they just didn't want Coolant's Service?
A. That's always possible.
Ferraris Dep. at 148.

nance plan, NRL would be entitled to royalties for those sales, pursuant to the license agreement between NRL and CCI. Assuming that CCI lost profits from its maintenance service as a result of Eppert's conduct and that Plaintiff can recover for lost sales of this unpatented maintenance service, NRL would be entitled to the amount of lost royalties it would have received from CCI's sales of its maintenance plan, to the extent that the amount of those loses could be proven. Accordingly, Defendant is not entitled to summary judgment on the ground that CCI, rather than NRL, offered the maintenance plan.

■■■■ *Second*, NRL is not precluded from seeking damages for lost service plan profits on the ground that Eppert did not offer a similar service plan. Courts have consistently held that a prevailing patentee can recover all foreseeable damages that were caused by the infringement. In *Rite–Hite*, the Federal Circuit stated that actual damages were not limited to lost profits of the patented product but, rather, the losses from the sale of plaintiff's unpatented items that competed with the infringing product were also compensable. Specifically, that court stated:

> Kelley's [defendant's] conclusion that the lost sales must be of the patented invention thus is not supported. Kelley's concern that lost profits must relate to the "intrinsic value of the patent" is subsumed in the "but for" analysis; if the patent infringement had nothing to do with the lost sales, "but for" causation would not have been proven. However, "but for" causation is conceded here. The motive, or motivation, for the infringement is irrelevant if it is proved that the infringement in fact caused the loss. We see no basis for Kelley's conclusion that the lost sales must be of products covered by the infringed patent.
>
> Kelley has thus not provided, nor do we find, any justification in the statute, precedent, policy, or logic to limit the compensability of lost sales of a paten-

tee's device that directly competes with the infringing device if it is proven that those lost sales were caused in fact by the infringement. Such lost sales are reasonably foreseeable and the award of damages is necessary to provide adequate compensation for infringement under 35 U.S.C. § 284.

56 F.3d at 1548–49. If the patentee has suffered price erosion as a result of the infringement, it may recover such losses as actual damages. *E.g., Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1580 (Fed.Cir.1992)(upholding award for price erosion due to infringer's marketing activities); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1579 (Fed.Cir.1992) (upholding award for price erosion due to infringing sales). Thus, provided that NRL can show that the distribution of KMMO caused it to lose profits on its service plans, those losses are compensable.

■■ NRL argues that it reduced its price due to Eppert's actions and that market forces did not have an impact on CCI's service price until 1994. The only evidence regarding CCI's pricing is provided by Mr. Ferraris. As noted by Eppert, he testified that "there's a lot of competition in the marketplace today that wasn't there prior to 1990," and that "we [CCI] started dropping our prices some years ago because we were no longer cost effective. We could not cost justify our service." (Ferraris Dep. at 99–100). He further testified that the 40 cent drop in service price occurred "because Eppert was being so successful in the field with the sale and their service with T–Cool, that they were driving the cost down for service in that field." (*Id.* at 141) Plaintiff notes that Mr. Ferraris also testified that other companies' attempts to enter the service business did not affect CCI's costs greatly, because the technology was not available until 1990, 1991, or 1992. (*Id.* at 141–42). However, Mr. Ferraris stated that "we didn't have a significant cost drop

until 1994, though." (*Id.* at 142). Based on Mr. Ferraris' statements that a significant cost drop did not occur until 1994, and that CCI's cost was affected by its need to justify its price to its clients and by the sale of T–Cool, Plaintiff has not established that it has suffered a $0.40 drop in service prices, from 1989 to 1994, as a result of Eppert's distribution of KMMO. Defendant is, therefore, entitled to summary judgment on Plaintiff's claim for damages due to price erosion of its maintenance service.

*Third,* Eppert argues that Plaintiff is not able to recover for any lost profits for the maintenance plan and OXCEDOT TREATMENT SERVICE, because they are unpatented products. As stated above, the Federal Circuit has stated that a patent owner may recover any lost profits that are reasonably foreseeable. *King Instruments Corp. v. Perego,* 65 F.3d 941, 953 (Fed.Cir.1995). In *Perego,* that court specifically concluded that the patentee could recover damages for unpatented goods. *Id.* Accordingly, NRL may recover lost profits for unpatented goods, at least in the abstract, where those losses were foreseeably caused by Defendant's infringement.

Defendant argues that Plaintiff's claim for damages based on its unpatented maintenance service should be evaluated using the entire market value rule. That rule "allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented." *Paper Converting Mach. Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 22 (Fed.Cir.1984). This is permitted when the patented feature is the basis for customer demand for the entire machine. *Rite–Hite,* 56 F.3d at 1549. Thus, the entire market value rule has been applied where both the patented and unpatented components together are "analogous to components of a single assembly," "parts of a complete machine," or

"constitute a functional unit," but not where the unpatented components "have essentially no functional relationship to the patented invention and . . . may have been sold with an infringing device only as a matter of convenience or business advantage." *Tec Air, Inc., v. Denso Mfg. Mich., Inc.,* 192 F.3d 1353, 1362 (Fed.Cir.1999) (quoting *Rite–Hite,* 56 F.3d at 1550). "The controlling touchstone in determining whether to include the non-patented [item] in a damage award is whether the patentee can normally anticipate the sale of the non-patented component together with the sale of the patented components." *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 865 (Fed.Cir.1985).

Eppert argues that the entire market value rule is inapplicable in the present case, because the maintenance service and OXCEDOT are not one "functional unit." In support of this argument, Eppert notes that OXCEDOT and the maintenance service are separate products. As stated by Defendant, CCI's OXCEDOT product is routinely sold individually, and in many instances, CCI does not sell the maintenance service but instead supplies free technical services, for no extra charge, to purchasers of OXCEDOT.

NRL has responded that OXCEDOT products were usually included in CCI's unpatented maintenance service (Ferraris Aff. ¶ 34). However, CCI's maintenance service could be and was, to a small extent, sold separately from the OXCEDOT product (Ferraris Aff. ¶ 36). Mr. Ferraris further stated that CCI's unpatented OXCEDOT TREATMENT SYSTEM was never sold separately from the patented OXCEDOT product (*Id.* ¶ 27). In summarizing the breakdown of CCI's business, he stated that, in 1989, 75% of CCI's business was the sale of products,[13] while 25% was service contracts (*id.* ¶ 20).

■ Based on the evidence provided by Plaintiff, NRL has raised a genuine issue

---

**13.** Mr. Ferraris stated that CCI's products included OXCEDOT (which contained MCC), the active ingredient, and ancillary products (Ferraris Aff. ¶ 19).

of material fact as to whether, 25% of the time, CCI could normally expect to sell its patented product at the same time that it sold its unpatented maintenance service. *See Ristvedt–Johnson, Inc., v. Brandt, Inc.,* 805 F.Supp. 557, 565 (N.D.Ill.1992)(awarding damages for lost profits on repair services and PMIA contracts in an amount equal to the percentage of contracts it would have sold on infringing sales). As stated by Mr. Ferraris, seventy-five percent of CCI's business was the sale of its product, while only 25% of CCI's business constituted sales of its unpatented service plan. He further stated that the unpatented OXCEDOT TREATMENT SERVICE was not sold without the patented OXCEDOT product. Accordingly, Plaintiff has provided evidence that 25% of its sales would have been accompanied by sales of CCI's unpatented service plan. However, a necessary predicate for Plaintiff to recover damages based on lost income from the unpatented maintenance plan is that it demonstrate that CCI would have made sales of its patented OXCEDOT to Eppert's customers had Defendant not distributed KMMO. With the exception of Castrol, Plaintiff has not provided evidence that it would have either sold OXCEDOT or its OXCEDOT TREATMENT SERVICE to any of Eppert's customers. (Plaintiff has provided evidence that Castrol failed to purchase CCI's service plan as a result of receiving KMMO from Eppert.) Thus, Plaintiff has not created a genuine issue of material fact that it would have sold its maintenance service to 25% of Eppert's customers who received KMMO. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for damages from the lost sales of CCI's maintenance service, with the exception of the alleged lost sales to Castrol. Because Plaintiff has provided evidence that Castrol would have purchased a service plan absent Eppert's distribution of KMMO, there are genuine issues of material fact as to whether Plaintiff suffered lost profits as a result of the lost Castrol service contract. Defendant's Motion for Summary Judgment on Plaintiff's claim for lost profits for its unpatented maintenance service is SUSTAINED IN PART and OVERRULED IN PART.

### 3. Lost Profits on CCI's Unpatented Copper–Based Products

■ Defendant argues that Plaintiff is not entitled to recover for any other unpatented products which CCI sells. Plaintiff argues that, but for Eppert's supply of KMMO to the Castrol account, it would have, in all reasonable probability, been able to sell the copper-related products (not covered by NRL's patents) to that customer. In support of its argument, CCI cites to the affidavit of Mr. Ferraris, in which he states that after Eppert stopped supplying KMMO to Castrol, CCI began making sales of copper-based products to that entity (Ferraris Aff. ¶ 47). There is no evidence that KMMO competed, in any respect, with CCI's copper-based products (other than OXCEDOT), and that the distribution of KMMO was related, in any way, to its failure to provide other copper-based products to Castrol. Notably, NRL has stated that CCI did not lose Castrol as a client, while Eppert supplied it with KMMO, and that it was selling other products to that customer, during that time. In addition, NRL has provided no evidence to quantify the amount of loss sales of other unpatented copper-based products. Accordingly, Plaintiff has not provided any basis from which the Court could conclude that it suffered lost profits from sales of CCI's unpatented copper-based product as a result of Eppert's actions. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for damages for its unpatented copper-based products.

### B. Reasonable Royalty

■ "A reasonable royalty 'may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing

licensee.' " *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1377 (Fed.Cir.1999); *Rite–Hite,* 56 F.3d at 1554. A single license agreement, without more, is insufficient proof of an established royalty. *Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1445 (Fed.Cir.1990). As noted by the Federal Circuit in *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed. Cir.1983), for a royalty to be established, it "must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention." *Id.* (*citing Rude v. Westcott,* 130 U.S. 152, 165, 9 S.Ct. 463, 32 L.Ed. 888 (1889)).

 Herein, the evidence supports Eppert's argument that a royalty rate has not been established. Construing the evidence in the light most favorable to Plaintiff, NRL has entered into two license agreements, both with the same company. Moreover, there is no indication that there was a "general acquiescence in the reasonableness" of the agreed upon rates. To the contrary, the facts that the 99% royalty rate virtually divested CCI, the only company to receive an exclusive license, of any benefit (profit) it would obtain from the agreement, and that the rate was established to enable NRL to take advantage of the tax code and to secure a loan, strongly negate an inference of reasonableness. Accordingly, there is no genuine issue of material fact on whether an established royalty rate exists. It does not. Defendant's Motion for Partial Summary Judgment, on the ground that a 99% royalty rate had not been established, is SUSTAINED.

 Where an established royalty does not exist, a court may determine a reasonable royalty based on "hypothetical negotiations between [a] willing licensor and willing licensee." *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988). The court must consider the "negotiations" as having occurred at the time that the infringement began. *Hanson,* 718 F.2d at 1079; *Wang*

*Laboratories, Inc., v. Toshiba Corp.,* 993 F.2d 858, 870 (Fed.Cir.1993). Relevant factors in determining a reasonable royalty may include:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial

embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971)

(cited with approval by *Unisplay, S.A., v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517, n. 7 (Fed.Cir.1995)). The determination of the amount of damages based on a reasonable royalty is an issue of fact. *Unisplay*, 69 F.3d at 517, *citing SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164 (Fed.Cir. 1991). In light of the number of factors which the Court must consider in determining a reasonable royalty rate and the fact that the parties have presented widely divergent estimates of such a rate (75% and 99% by Plaintiff and 5% by Defendant),[14] the Court concludes that there are genuine issues of material fact as to what constitutes a reasonable rate in the present lawsuit.

In summary, with the exception of its providing of KMMO to Castrol, Defendant is entitled to summary judgment on Plaintiff's claim for actual damages due to its alleged loss of OXCEDOT sales, its alleged lost of unpatented copper-based products, the alleged price erosion of its maintenance service, the alleged lost of maintenance service customers. NRL has created a genuine issue of material fact as to whether it suffered lost profits of OXCEDOT and CCI's maintenance services due to the distribution of KMMO to Castrol. Plaintiff has not established that its royalty rates of 75% or 99% are established. The Court further concludes that a genuine issue of material fact exists as to an appropriate reasonable royalty rate. Defendant's Motion for Partial Summary Judgment (Doc. # 88) is therefore SUSTAINED IN PART and OVERRULED IN PART.[15]

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment on

---

**14.** Defendant's expert states that a reasonable royalty is commonly 5% of the licensee's net revenue (Doc. # 91, Ex. B).

**15.** Defendant's damages calculations include treble damages. Plaintiff has not argued that Defendant is not entitled to increased dam-

ages, as a matter of law. Accordingly, the Court has not addressed that issue. In addition, the Court has not addressed the issue of attorney fees and costs, because that issue has not been raised by the parties either.

Damages (Doc. # 88) is SUSTAINED IN PART and OVERRULED IN PART.